Filed 1/26/24 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of QUIN WHITMAN and DOUGLAS F. WHITMAN. | |
| QUIN WHITMAN,<br><br>　　　　Appellant,<br><br>v.<br><br>DOUGLAS F. WHITMAN,<br><br>　　　　Appellant. | A157055<br><br>(San Mateo County<br>Super. Ct. No. FAM0117304)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

The Petition for Rehearing filed by appellant Douglas F. Whitman is denied. New factual or legal arguments will not be entertained for the first time in a petition for rehearing. (*Reynolds v. Bement* (2005) 36 Cal.4th 1075, 1092; accord, *In re Foster* (2022) 85 Cal.App.5th 499, 512, fn. 8.)

It is ordered that the opinion filed herein on December 29, 2023, be modified as follows: On page 15, the reference to "July 3" in the first sentence of the second paragraph under the heading "1. Background" is changed to "July 12" so that the sentence, as modified, states: "The evidence

1

showed that nine days later, on July 12, 1995, the parties bought a home for $1.45 million financed with a $1 million mortgage and a $450,000 down payment."

There is no change in the judgment.

Dated:_____

_____

STEWART, P.J.

Trial Court: San Mateo County Superior Court

Trial Judge:        Hon. Elizabeth M. Hill

Counsel:

California Appellate Law Group, Complex Appellate Litigation Group, Charles Kagay, Robert A. Roth, and Kelly A. Woodruff, for Defendant and Appellant.


McManis Faulkner, James McManis, William Faulkner, Brandon Rose, and Beverly Bergstrom, for Plaintiff and Respondent.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re the Marriage of QUIN WHITMAN and DOUGLAS F. WHITMAN. | |
| QUIN WHITMAN,<br><br>        Appellant,<br><br>v.<br><br>DOUGLAS F. WHITMAN,<br><br>        Appellant. | A157055<br><br>(San Mateo County<br>Super. Ct. No. FAM0117304) |

Douglas F. Whitman (Doug), the founder of a once highly successful hedge fund, and Quin Whitman (Quin) each appeal from a judgment entered after a lengthy court trial in their contested divorce.

We affirm the judgment in all respects but one. We conclude:

(1) The trial court did not err in ruling that Doug failed to prove he retained any separate property interest in the hedge fund at the time of dissolution, despite an initial $300,000 capital investment of his own separate funds.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion parts I, III and IV.

(2)  The community is not financially responsible for any of the legal fees Doug incurred to defend against criminal charges brought against him for insider trading or the $250,000 fine imposed on him in that case.  The trial court thus did not err in characterizing those as Doug's separate debts. It erred in holding the community responsible for the $935,000 penalty the Securities and Exchange Commission (SEC) imposed on Doug in the parallel enforcement action for engaging in illegal insider trading while running the hedge fund during the marriage.  It did not err in holding the community responsible for $290,000 in legal fees Doug incurred in that parallel SEC enforcement case.

(3)  Quin has not demonstrated the court erred in holding the community responsible for legal fees expended by the hedge fund when it intervened as a third party into these proceedings.

(4)  The court did not err in concluding Quin failed to prove her claim that Doug breached his fiduciary duty in connection with the sale of the couple's luxury home.

## BACKGROUND

Quin and Doug married in 1992.  By then, Doug had spent nearly a decade working as a highly compensated financial analyst at several investment firms and had amassed substantial separate property savings. During the first two years of their marriage, the couple lived frugally, while Doug continued to work in the financial sector and earn a high income.  In 1994, Doug was terminated from his position at the investment bank where he had been working and decided to form his own investment fund (or "hedge fund").

To launch the hedge fund and attract outside investors, Doug invested $900,000 of capital in three rounds of funding during 1994.  A major

2

contested issue at trial was whether any portion of that capital infusion was Doug's separate property and, if so, whether it could be adequately traced decades later at the time of dissolution. We will discuss that subject in greater detail below in the unpublished portion of this decision.

By the end of 2011, the hedge fund had proved a tremendous success, having grown cumulatively 2118.7 percent from its inception. At its peak, it had more than 60 outside investors and nearly $300 million in assets.

But in February 2012, the U.S. Attorney in the Southern District of New York charged Doug with crimes and the SEC filed an enforcement action against him and Whitman Capital for insider trading.[1] Within months, by the end of March 2012, all the outside investors had withdrawn from the hedge fund, leaving only about $29 million in equity belonging to Doug (effectively). The following year, in January 2013, Doug was convicted of four counts of insider trading, sentenced to 24 months in prison, assessed a $250,000 criminal fine and ordered to forfeit $935,306. Then in March 2013 Doug settled the SEC action and paid a $935,306 civil penalty.

Over time, the hedge fund had earned handsome profits and Doug was extremely well compensated. During their marriage, Doug reinvested all of his annual compensation back into the fund, and the parties withdrew more than $88 million from the fund.

---

[1] Doug created three related entities when he formed the hedge fund: a limited partnership called Whitman Partners, L.P. (WPLP) that constituted the actual investment fund itself, in which Doug and outside investors were limited partners; Whitman Capital, LLC, which was owned and managed by Doug and was the general partner of WPLP (effectively making Doug the managing general partner of WPLP); and Whitman Capital, Inc., of which Doug was the president, director and sole shareholder, which was a member of Whitman Capital, LLC. Whitman Capital, Inc. was used to pay all operating expenses of the hedge fund, including employee salaries.

On April 11, 2012, two months after the civil and criminal charges were filed, Quin filed a petition for legal separation that was later amended to a petition for dissolution. The following year, in June 2013, the hedge fund was granted leave to intervene in the case after Quin sought the appointment of a receiver to wind it down. Her efforts in that regard were ultimately not successful, and we discuss in greater detail below (in the unpublished portion of this opinion) the trial court's ruling concerning the legal fees the hedge fund incurred to appear in the case.

The case proceeded to 30-day bench trial between March 2017 and January 2018 on the characterization and division of numerous marital assets. The court issued a 133-page statement of decision, entered judgment and denied the parties' new trial motions. Both parties then timely appealed.

## DISCUSSION

### I.

### *Characterization of the Parties' Interests in the Hedge Fund*

The largest marital asset at issue in the contested trial was the parties' interest in the hedge fund, which by the time of trial was valued at approximately $31.6 million. Doug testified he started the fund with separate funds, specifically, a capital investment of $900,000 of savings he had accumulated before the marriage. He testified he made three separate deposits in 1994: a $500,000 investment in July, a $300,000 investment on October 1 and another $100,000 on November 25.

It is undisputed that after the initial investment, Doug continued to invest into the hedge fund capital account the compensation he earned from managing the hedge fund. Since he concedes that the compensation was community property, this resulted in the capital account being a commingled account. Doug does not dispute that those subsequent investments of

4

community property funds and the growth associated with them are community property.

The source of the initial $900,000 capital contribution was a major contested issue at trial. Doug asserted that the bulk of the hedge fund's value was traceable to his initial $900,000 separate property investment and its associated gains, a separate property interest he now values at nearly $18 million.

In a portion of the statement of decision encompassing 20 pages, the trial court concluded the entirety of the parties' remaining interest in the hedge fund is community property, subject to equal division. First, it found Doug had proved only that the $300,000 portion of the $900,000 initial capital investment was traceable to his separate property. Second, it found that Doug's withdrawal of $900,000 on July 3, 1995, less than a year after the initial investment was made, exhausted any separate property interest he had in the fund from that date forward.

On appeal, Doug argues the court erred by rejecting his contention that July 1994 investment of $500,000 and the November 2024 investment of $100,000 into the hedge fund capital account were traceable to his pre-marital separate property. He also challenges the trial court's conclusion that the $900,000 withdrawal depleted his separate property interest in the fund. In addition to asserting there was no error, Quin argues that even if any traceable separate property remained in the account, the gains attributable to community efforts must be allocated to the community. It is unnecessary to address the latter issue because we will affirm the court's characterization of the entire fund as community property.

5

## A. Legal Principles

Property acquired during marriage is presumed to be community property (Fam. Code, § 760),[2] a principle that " 'is perhaps the most fundamental . . . of California's community property law.' " (*In re Brace* (2020) 9 Cal.5th 903, 914.)  On the other hand, property owned by a spouse before marriage is that spouse's separate property, including all of the "rents, issues, and profits" of such property.  (§ 770, subds. (a)(1), (a)(3); *Brace*, at p. 914.)  Thus, "a spouse may rebut the Family Code section 760 presumption by tracing the source of funds used to acquire property [during the marriage] to separate property." (*Brace*, at p. 914.)  " 'Separate funds do not lose their character as such when commingled with community funds in a bank account so long as the amount thereof can be ascertained.' " (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 612 (*Mix*).)  But it is the spouse who asserts a separate property interest in property acquired during marriage who bears the burden to prove it.  (*Estate of Murphy* (1976) 15 Cal.3d 907, 917 (*Murphy*).)

When separate property is commingled in an account with community property, as it was here, tracing is a factual issue for the trial court. " 'Whether separate funds so deposited continue to be on deposit when a withdrawal is made from such a bank account . . . , and whether the intention of the drawer is to withdraw such funds therefrom are questions of fact for determination by the trial court.' " (*Mix*, *supra*, 14 Cal.3d at p. 612.)

## B. Standard of Review

" 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable

---

[2] All further statutory references are to the Family Code unless otherwise indicated.

inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." ' " (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 94 (*Ciprari*).)

" 'In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment.' " (*Ciprari, supra,* 32 Cal.App.5th at p. 94.) " ' "[A]ny conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." ' " (*Ibid*.) Furthermore, " '[t]he substantial evidence standard applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial.' " (*Ibid*.)

### C. The Starting Capital

As noted, the trial court concluded that Doug failed to prove that his separate property was the source of the initial $500,000 investment he made to the hedge fund in July 1994 and the subsequent $100,000 investment he made in November 1994. As to each one, Doug argues that the uncontroverted evidence satisfied his burden that the funds did come from a separate property source, and that the trial court misapplied the law in concluding otherwise. On the latter point, he contends the court erred by imposing an unduly high burden of proof by faulting him for not introducing records showing how the funds moved to the hedge fund from his separate property pre-marital brokerage accounts, which he says is not required.

7

Although Doug frames these questions as two distinct issues, in reality they are just opposite sides of the same coin. That is to say, Doug, who rightly acknowledges that the burden was on him to prove that the funds he used to invest in the new Whitman entities were derived from a separate property source, contends that his evidence leaves no room for a judicial determination that it was insufficient on this score. (See *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 (*Sonic Manufacturing*); *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) In other words, he contends that he proved his case as a matter of law. (*Ibid.*) His separate contention that the court committed a legal error because it found his evidence wanting for lack of specific documentary proof is just another way of saying the same thing—that he proved his case as a matter of law, even in the absence of such documentary evidence. So that is the question to which we now turn.

### 1. The $500,000 Investment

Doug testified that the initial $500,000 investment in July 1994 came from his pre-marital brokerage account at Hambrecht and Quist. He introduced documentary evidence to substantiate that claim, which the trial court examined in detail and which it ultimately concluded "fail[ed] to establish" that the Hambrecht account was the source of the $500,000 investment. The principal document was the hedge fund's brokerage account statements (with Bear Stearns), which contained a cryptic entry[3] that Doug testified reflected a journal transfer to the hedge fund of $500,000 in funds, by means of a letter of authorization from Doug's personal account at Bear

---

[3] The notation states: "LOA JRL FR 500 02100 TO PURCHASE L.P."

8

Stearns (his so-called "manager" account, which was set up for him when the hedge fund's prime broker relationship with Bear Stearns was established). Doug testified that he funded that personal account with money from his Hambrecht account. He testified his Hambrecht account was worth between $600,000 and $700,000 when he and Quin married and continued to grow after that. He testified he transferred "a good amount" of his money from Hambrecht to his personal account at Bear Stearns, and "would have imagined" he moved more than $500,000 because he used his Hambrecht account to fund the initial investment. And he testified the reason he used money from his Hambrecht account was because his broker there (a cousin) wouldn't invest in the hedge fund or help him find investors.

Doug also testified that Quin was risk-averse and didn't want him to invest any community property in the fund. He also asserts that Quin testified "they did not agree to put any community funds" into the hedge fund and "*agreed* with Doug that the parties only agreed to use $50,000 in community funds to start Whitman Inc. and not to invest in the Fund."

Doug argues this evidence compels a finding in his favor. We disagree.

In the first place, Doug misstates Quin's testimony. Quin did not testify that she objected to investing their money in the hedge fund or that they agreed Doug would not do so. The only conversation she specifically recalled was that when he initially told her he wanted to start his own investment firm, he said he wanted to use $50,000 of their money to start the business.[4] She testified Doug never told her how much money he put into the

_____

    [4] Doug testified that $50,000 was used to pay initial operating costs (through Whitman Capital, Inc.) not seed the actual investment fund. He testified initially there was no need for more startup capital, because it would take some time to actually set up the hedge fund and "you don't really pay

9

fund and she didn't know any of the details where the initial money came from. And in portions of testimony not cited by Doug, she testified he never told her he intended to invest any of his *own* money from before the marriage in the hedge fund and recalled he had already made a significant amount of money that year in his prior job (i.e., community earnings) and was "pretty sure" he put a portion of it into the hedge fund. To the extent Quin's testimony proves anything about the source of the funds, it supports a reasonable inference that Doug used community property to start the hedge fund.

But the even greater problem, and dispositive one, is that the court ruled that even if oral testimony alone could satisfy Doug's burden of proof, his testimony about the source of the $500,000 investment was "unreliable" and not "persuasive," because he "suffered a serious failure of recollection" concerning that subject until shortly before trial. Throughout pre-trial discovery, Doug consistently claimed that the source of the $500,000 investment was a different pre-marital brokerage account (Alex Brown), and even hired an expert who accepted and relied on that assertion. Then at trial, they both claimed they had been mistaken because Doug had erroneously recalled his Alex Brown account as the source of the $500,000 deposit based on a different entry on the same page of the hedge fund's brokerage account statement reflecting another $500,000 cash deposit the same date which Doug had misinterpreted.

Doug contends that his pre-trial "failure of recollection" does not affect the calculus. But his argument on this point essentially asks us to second-

_____

until after the fund's up and running" and so "I just remember not needing that much money of the community to start."

10

guess the court's credibility determination and reweigh the evidence, which we cannot do. (See *Ciprari*, *supra*, 32 Cal.App.5th at p. 94.) The trial court could and did find Doug's recollection about the source of the $500,000 he used to fund the initial capital investment was not reliable. We are bound by that assessment.

### 2. The $100,000 Investment

Doug introduced documentary evidence that $100,000 was credited to his capital account on November 25, 1994. The hedge fund's brokerage account statement reflected a $100,000 deposit the same day from a Northern Trust account.

Doug testified that the source of the $100,000 deposit was his pre-marital brokerage account at *Gardner Lewis*, which was the same account he had used to fund the $300,000 investment he made the prior month (on October 1). On August 31, 1994, Doug had written to Gardner Lewis expressing his intention to liquidate all of his holdings there in order to invest it all in the hedge fund. The trial court found that Gardner Lewis then wired $300,000 directly to the hedge fund (on September 30) and sent Doug two checks totaling $212,152: one for $150,000 on September 30 and one for $62,152 on October 21. Doug testified he deposited the checks into his personal Bear Stearns account, invested $100,000 of those proceeds in the hedge fund and, over time, invested most of the $112,000 balance in another outside investment and used some for community purposes. Doug's expert testified, based on research of public SEC filings, that Northern Trust had a banking relationship with Bear Stearns (consisting of an unexplained "lending relationship").

Because Doug presented no evidence that the Gardner Lewis checks were deposited into a Northern Trust account and, indeed, failed to proffer

11

any Northern Trust account statements, the trial court found insufficient evidence that Gardner Lewis was the source of the $100,000 that Northern Trust transferred to Doug's capital account at the hedge fund.

Doug asserts that no such documentary evidence was required, because his "credible, uncontroverted testimony, supported by contemporaneous business records" left no room for a determination that his evidence was insufficient to carry his burden of proof. Citing *Mix*, *supra*, 14 Cal.3d 604, *Huber v. Huber* (1946) 27 Cal.2d 784, and *In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, he argues the trial court misapplied the law by requiring specific records showing how the $100,000 moved from account to account. Again, we are not persuaded.

The authorities Doug cites stand for the proposition that a judgment supported by uncorroborated testimony about a separate property source of contributions to a dispute asset *may be affirmed*.[5] They do not stand for the proposition that a judgment rejecting uncorroborated testimony about the

---

[5] See *Mix*, *supra*, 14 Cal.3d 604 at p. 614 (giving respondent the benefit of all reasonable inferences on appeal, "the trial court was warranted in inferring . . . that the bank records if introduced would fully verify . . . [respondent's] testimony" about separate property contributions to, and withdrawals from, commingled bank accounts); *Huber v. Huber*, *supra*, 27 Cal.2d at pp.790-791 (respondent's testimony he purchased real estate with funds from separate property bank account "is clearly sufficient to support a finding that the property was paid for from his separate funds"); *In re Marriage of Ficke*, *supra*, 217 Cal.App.4th at pp. 25-27 (where there was conflicting evidence as to whether account from which mortgage payments were made was commingled, trial court "was perfectly entitled to believe [husband] . . . and impliedly find there was no commingling or payments from a community account," and was not required to assume the payments came from community property absent specific documentation to the contrary).

source of funds used to invest in, or purchase, a disputed asset *must be reversed.*

Here, Doug's evidence left ample room for doubt that Gardner Lewis was the source of the $100,000 deposit. There was no corroborating evidence that Doug actually deposited the Gardner Lewis checks into his Bear Stearns account. As Quin puts it, "the trail ends" after Gardner Lewis mailed those checks out. Nor does the mere fact that the funds came through a financial institution (Northern Trust) that had a banking relationship with the brokerage firm (Bearn Stearns) where Doug claims he deposited his Gardner Lewis money indicate (much less compel a finding) that Doug's Bear Stearns account was the *source* of that transfer (as opposed to Northern Trust transferring the money from another account at either Bear Stearns or another financial institution that also had a banking relationship with Northern Trust). Finally, Doug made no attempt to show that, at the time the capital investments were made, there were no community assets on deposit at Northern Trust.[6]

Doug's letter expressing his intentions to use all of his Gardner Lewis money to invest in the hedge fund also does not help him, because it cuts both ways. He indisputably acted in accordance with his expressed intentions when, as found by the trial court, he invested $300,000 of that money in the hedge fund. But he also quite concededly used at least $112,000 of that

---

[6] He asserts in his brief that he "did not maintain any accounts at Northern Trust" but does not cite any evidence to support that assertion. We disregard statements of fact unsupported by citations to the record. (*Madrigal v. Hyundai Motor America* (2023) 90 Cal.App.5th 385, 408, fn. 14, review granted August 30, 2023, S280598.)

13

money for other purposes. The letter thus does not tend to show that Doug used the remainder of the Gardner Lewis money to invest in the hedge fund as opposed to other purposes, such as those to which he admittedly devoted some part of those funds.

So, we are left with questions and holes that were the province of the trial court to evaluate. Although Doug's evidence would have been sufficient to sustain a ruling in his favor, the " 'weight and character' " of his evidence was not " 'such that the [trial] court could not reasonably reject it.' " (*Trinity v. Life Ins. Co. of America* (2022) 78 Cal.App.5th 1111, 1121.)

Tracing funds to a separate property source must be done " 'not by way of surmises and probabilities, but by plain and connected channels.' " (*In re Boody's Estate* (1896) 113 Cal. 682, 687.) The trial court was not required to believe Doug's testimony, much less accept it as a conclusive, accurate recollection. It was free to give the testimony whatever weight it deemed appropriate under the circumstances, including just the passage of time, the failures of his recollection and the complexity of his financial holdings. In the absence of adequate records tracing the $100,000 contribution to a separate property source, the trial court was not required to rule in his favor. (See, e.g., *Murphy, supra,* 15 Cal.3d at pp. 912, 918 [affirming ruling that heirs failed to overcome presumption that various assets had been purchased with decedent's separate property, because "[n]one of the separate income was directly traced into any particular bank account or other asset" and "no records adequate to identify any particular portions of . . . commingled funds as derived from community or separate property sources"]; *In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 266, 273 [no error to deny request for reimbursement of separate property funds withdrawn from retirement account and other sources that were allegedly used to construct residence,

14

where there was only "testimony about the money used to construct the house, [but] no documents"].)  "[T]he burden of establishing a spouse's separate interest in presumptive community property is not simply that of presenting proof at the time of litigation but also one of keeping adequate records."  (*Murphy*, at p. 920.)  Doug failed to do that, and he bore the risk that, decades later, it might redound to his detriment.

### D.  The $900,000 Withdrawal

Because the trial court found that Doug proved he invested $300,000 of his own separate pre-marital earnings in the hedge fund, we next turn to its conclusion that Doug nevertheless had no separate property interest remaining by the time of trial because he withdrew $900,000 from the hedge fund a short time later, in July 1995.

### 1.  Background

It is undisputed that on July 3, 1995, less than a year after Doug started the hedge fund, he withdrew $900,000.  There was no documentary evidence showing how those withdrawn funds were used.  However, he testified at trial that he deposited the $900,000 into one of his separate pre-marital accounts.

The evidence showed that nine days later, on July 3, 1995, the parties bought a home for $1.45 million financed with a $1 million mortgage and a $450,000 down payment.  It also showed they spent another $1.5 million to perform extensive upgrades and renovations to the home (the precise timing of which is not specified) and to furnish it.

Doug testified that he withdrew $900,000 because he was advised that was the maximum he could take out of the hedge fund capital account tax-free.  He testified he deposited the $900,000 into a brokerage account he maintained at Alex Brown, which was one of many pre-marital brokerage

15

accounts he maintained, that he used $450,000 of it for the down payment on the house, and that the rest went toward the expense of renovating the newly purchased home. He denied that he had any intention of withdrawing his initial separate capital investment in the Fund. Quin testified she believed the down payment came from Doug's marital earnings from both his prior job at Montgomery Securities and from managing the fund but couldn't recall details.

The trial court concluded the $900,000 depleted Doug's separate property investment in the hedge fund. It ruled that Doug had "not met his burden [of proof]" to trace his separate property interest in the fund due to the absence of any "records of separate and community property payments as they occurred" after the money had been withdrawn. It also rejected Doug's testimony that the withdrawal was used in connection with the home purchase and the assumption of Doug's tracing expert to the same effect, because Doug testified that he deposited the withdrawn funds into his separately titled Alex Brown account. The court concluded that Doug's "testimony establishes that he removed $900,000 from the [hedge fund] capital account to an account that, at the time of the removal, was [a] separately titled account established before marriage at Alex Brown," and that in light of Doug's failure to "provide any documentary evidence at trial to trace use of the funds after they were deposited into that account," there was "insufficient evidence to conclude that the funds were expended for community purposes." The court later amended its statement of decision on this issue when it denied Doug's post-trial motions, adding a finding that Doug "offered general testimony to a web of pre-marriage brokerage accounts with money moving between them at various times, but there was no precise evidence of what separate property was held in which brokerage accounts at

16

the time of marriage, nor any attempt to quantify when and in what amounts separate and community property were commingled in those accounts." This was because Doug "focused his tracing evidence on only one account—the WPLP capital account."

### 2. Analysis

Doug argues the court erred by failing to *presume* that the withdrawal was for a community expense, which he contends is a legal error subject to our de novo review. Relying principally on *Ciprari, supra,* 32 Cal.App.5th 83, he maintains the law presumes that any withdrawal from a commingled account is withdrawal of community funds used for community expenses unless the spouse challenging the tracing analysis proves otherwise. So, he argues, the $900,000 withdrawal was presumptively a withdrawal of community funds unless Quin proved a separate use of those funds. He contends the trial court committed legal error by instead placing the burden on him to prove the withdrawn $900,000 was put to a community use.

Alternatively, he argues the court erred because the uncontradicted evidence *proved* that the $900,000 withdrawal was made for community purposes—namely, for the purchase and renovation of the couple's new home.

It is unnecessary to decide whether the court erred by failing to apply the favorable legal presumption that Doug posits. We agree with Quin, who contends that the trial court *also* properly found that any such presumption had been rebutted. In effect, Quin's argument (although not framed as such) is that any error regarding who bore the burden of proof was harmless.

Specifically, Quin argues that "[e]ven if the trial court were to have presumed that any withdrawals were used to pay community expenses . . . , the trial court found such a presumption would be rebutted by Doug's testimony that he deposited the funds into his separately titled Alex Brown

17

brokerage account, as opposed to a joint checking account where community expenses were paid." And, she contends, we have no power on substantial evidence review to second-guess that finding, citing *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 (*Schmidt*). We agree.

As noted, the court concluded that Doug's "testimony establishes that he removed $900,000 from the WPLP capital account to an account that, at the time of the removal, was [a] separately titled account established before marriage at Alex Brown," and that in light of Doug's failure to "provide any documentary evidence at trial to trace use of the funds after they were deposited into that account," there was "insufficient evidence to conclude that the funds were expended for community purposes." Doug implies that Quin misconstrues the statement of decision. He asserts this was "*not* [a] find[ing] that the fact [he] put the withdrawn funds into his Alex Brown account established he used them for a separate property purpose." But we do not read it that way. Doug's gloss on the court's comments violates the principle, expressed in the very authority he urges us to follow, that " 'findings of fact are liberally construed to support the judgment.' " (*Ciprari, supra,* 32 Cal.App.5th at p. 94; accord, *Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 792.)

At best, the court's comments are ambiguous, which means the doctrine of adverse implied findings steps in to fill the gap. "[I]f the statement [of decision] . . . is ambiguous the defect[] must be brought to the court's attention to avoid presumptions in favor of the judgment." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1136 (*Arceneaux*); Code Civ. Proc., § 634.) When a party fails to do this, then " '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' "

18

(*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) Here, nothing in the record indicates Doug objected that the foregoing aspect of the court's statement of decision was ambiguous or unclear.[7] On the contrary, when Doug filed objections to the court's *proposed* statement of decision earlier on, he acknowledged the court *had* made a factual finding on this issue in Quin's favor: he said the court had "erred" in making what he characterized as an "implied finding that the $900,000 withdrawal is traceable to Respondent's separate property because it was deposited in his Alex Brown account." For all of these reasons, we construe the court's decision as encompassing a finding that Doug intended to withdraw his *separate property* from the fund, as evidenced by his deposit of the funds into his own separately titled pre-marital account.

As noted by Quin, that finding is supported by substantial evidence. Under the highly deferential standard of substantial evidence review, we must "accept all evidence supporting the trial court's order," "completely disregard contrary evidence," "draw all reasonable inferences to affirm the trial court" and "we do not reweigh the evidence." (*Schmidt*, *supra*, 44 Cal.App.5th at p. 581.) "Under this standard of review, parties challenging a trial court's factfinding bear an 'enormous burden.' " (*Id*. at p. 582.) Here, Doug had a "web of pre-marriage brokerage accounts" that had "money moving between them at various times." The trial court could reasonably infer that by immediately depositing the withdrawn funds into one of them that he maintained in his sole name rather than into a joint checking account, Doug reflected an intention to withdraw his separate

---

[7] His new trial motion asked the court to clarify certain other findings, but it did not ask for any clarification of the court's comments concerning the $900,000 transfer of funds to his Alex Brown account.

19

property capital from the hedge fund. That was a factual issue for the trial court to resolve, and we are bound by its determination. (See *Mix*, *supra*, 14 Cal.3d at p. 612 [Whether separate funds " 'continue to be on deposit when a withdrawal is made from . . . a [commingled] bank account . . . , and whether the intention of the drawer is to withdraw such funds therefrom, are questions of fact for determination by the trial court' "].)

Doug's only argument on the substantial evidence point is that "it is *irrelevant* if [he] put the withdrawn funds into a premarital brokerage account because neither [he] nor Quin tried to prove the funds were then used for a separate property acquisition." (Italics added.) But that is a non-sequitur. He cites no authority such proof was required. The question was whether *at the time of the withdrawal* he was intending to withdraw his separate property (see *Mix*, *supra*, 14 Cal.3d at p. 612), not what became of the money later at another point in time (including whether he might have subsequently gifted it to the community and/or hopelessly commingled it past the point of discernible tracing).

Doug also asserts that "the *uncontradicted* evidence established that the withdrawn cash was eventually used for community purposes." We do not agree. The trial court was not required to credit Doug's testimony about how the money was spent even though it was uncontradicted. (See *Hicks v. Reis* (1943) 21 Cal.2d 654, 659-660; *Schmidt*, *supra*, 44 Cal.App.5th at p. 582.) Furthermore, the trial court could reasonably infer there were ample other community sources to fund the new home purchase and subsequent renovations rather than this particular withdrawal from the hedge fund.[8]

---

[8] Doug testified he had over $1 million in his brokerage account at Montgomery by the time he started the hedge fund in 1994, which he concedes in his brief is the account that held all his community earnings that

20

In sum, Doug has demonstrated no basis to reverse the court's characterization of the hedge fund as entirely community property.

## II.

### *Legal Fees and Fines Arising from Doug's Insider Trading*

Between 2007 and 2009, while the parties were married, Doug engaged in insider trading, purchasing interests in Google and two other companies based on tips he received from company insiders. The question of who should be responsible for the financial repercussions of Doug's criminal conduct divided the parties below and remains an issue in this appeal.

Both parties challenge the trial court's ruling on Quin's request that it treat as Doug's separate obligation, and reimburse the community for, the debts incurred as a result of his criminal conduct, including the debts for the civil penalty, the criminal fine and the attorney fees incurred for his defense in the parallel criminal and SEC cases. The trial court ruled the community was responsible for the $935,000 civil penalty and $290,000 in attorney fees and costs associated with the SEC action. It held that the $9.4 million in attorney fees spent defending him against the criminal action and the $250,000 criminal fine were Doug's separate debts for which he, not the community, was responsible.

Doug claims the trial court erred in failing to allocate the entire cost of his criminal conduct to the community. Quin, who knew nothing about Doug's criminal wrongdoing until after the fact, and therefore had no

---

pre-dated his launch of the hedge fund. In addition, there was documentary evidence that over the course of a year and a half after the couple bought their new home, Doug withdrew another $1.4 million from the fund in total (during 1996), including $625,000 on January 1, 1996, which was about six months after the couple bought the home in the summer of 1995.

opportunity to avoid it, argues the trial court should not have allocated any of these losses to the community.

In the alternative, Doug also challenges the amount of legal fees and costs the trial court attributed to the SEC action, contending the trial court erroneously excluded evidence that resulted in the court vastly underestimating those expenses.

We affirm the trial court's decision in all but one respect. It erred only to the extent it characterized the SEC penalty Doug was ordered to pay in the SEC case as a community obligation. The penalty he paid to settle the SEC case, the criminal fine imposed against him, and all but $290,000 of the attorney fees Doug incurred to defend himself are Doug's separate responsibility. And our reasoning for affirming the allocation of the $290,000 to Doug is distinct from that of the trial court and renders it unnecessary to address Doug's challenge to the amount of legal fees the court allocated to his defense of the SEC case.[9]

## A. Background

In January 2011, Doug retained the law firm Sidley Austin to assist him in connection with investigations into his trading activities launched by federal prosecutors in New York and the SEC. His legal team spent the next year negotiating with both sets of New York investigators in an attempt to convince them not to charge Doug, while simultaneously investigating the case and preparing a defense.

---

[9] Our analysis concerns the allocation of financial responsibility between divorcing spouses arising from one spouse's criminal conduct. We do not address either spouse's or the community's liability to third parties for such conduct.

Their negotiating efforts failed, and in February 2012, a grand jury returned an indictment. Doug was charged in the federal district court for the Southern District of New York with four federal criminal securities law violations, including two charges for conspiracy to commit securities fraud and two charges of securities fraud. The charges alleged Doug engaged in two insider trading schemes that involved purchasing securities in three publicly traded companies based on inside information obtained from two different sources.

Contemporaneously, the SEC filed a complaint against Doug and Whitman Capital arising out of some of the same insider trading as was alleged in the criminal indictment. The complaint alleged that based on the insider information, "Whitman Capital hedge funds reaped approximately $980,000 in ill-gotten profits." It sought injunctive relief, disgorgement and civil penalties.

Two months later, in April 2012, Doug and Quin separated.

After pleading not guilty in the criminal action, Doug was tried by a jury, which in August 2012 found him guilty on all four counts. In January 2013, the court sentenced him to two years' imprisonment, a year of probation, a fine of $250,000 and forfeiture of $935,306. The forfeiture amount represented "the amount of proceeds obtained as a result of the offenses" charged in the indictment.

About two months later, on March 19, 2013, Doug and Whitman Capital consented to entry of judgment against them in the SEC action. The judgment permanently enjoined them from violating the antifraud provisions of the Securities Exchange Act of 1934 and the Securities Act of 1933; imposed joint and several liability on them for "disgorgement in the amount of $935,306, representing profits gained as a result of the conduct alleged in

the Complaint" (plus prejudgment interest), which was to be "credited" by the amount paid for the criminal forfeiture; and also required Doug to pay a "civil penalty in the amount of $935,306" to the SEC. Doug also agreed he would "not seek or accept, directly or indirectly, reimbursement or indemnification from any source" or claim any tax deduction or credit with regard to the civil penalty. The settlement also included an order barring Doug from associating with brokers, dealers, investment advisors and other securities industry entities.

The disgorgement payment was charged against the limited partners' shares, about two-thirds of which were the "public" limited partners and one-third Doug's and his companies' shares. The civil penalty was paid out of Doug's partnership account at Whitman Partners.

Doug posted bail and apparently avoided serving prison time while he appealed the criminal conviction, but ultimately, the Second Circuit affirmed his convictions, the United States Supreme Court denied his petition for certiorari, and he served all or some part of a 24-month prison sentence.

The trial court found that Doug's intentional, criminal conduct benefitted the community in the amount he and Whitman Capital were ordered to disgorge ($935,306)[10] and "arose from the operation of the

_____

[10] The SEC complaint alleged that the proceeds of the insider trading went to the Whitman Capital hedge fund, and Doug admitted that he charged the disgorgement to the limited partners, including his one-third share. This suggests that only a third of the $935,000 in proceeds from Doug's insider trading ultimately were disbursed to the community. However, the trial court found that the community benefited from Doug's criminal conduct "in the amount of the $935,306 disgorgement that [Doug] was obligated to pay," and the parties do not challenge this finding. Further, Quin withdrew her request for reimbursement of the disgorgement payment in the trial court for reasons that are not clear. Therefore, we need not address the issue of the

24

community business" but that Quin had no knowledge of it or any opportunity to "avoid it."

However, one thing is clear from the undisputed facts: the cost of Doug's criminal conduct far exceeded the amount of short-term financial gain to the community as found by the trial court. First, the gain was completely wiped out by the criminal forfeiture, which was dollar for dollar offset by the amount of the civil disgorgement remedy. On top of that, there was the additional civil penalty of $935,000 and the criminal fine of $250,000. And dwarfing even that substantial penalty and fine combined was the $9.7 million Doug spent for the Sidley Austin law firm to defend him in the parallel actions. Even assuming the community benefited in the amount of $935,000 from Doug's insider trading (see fn. 10, *ante,* page 24), the combined total of the civil penalty, criminal fine and attorney fees Doug incurred ($11,885,000) is almost 13 times that amount. And it is impossible to quantify the ongoing loss of income available to support the community that resulted after Doug's criminal conduct was discovered and the limited partners withdrew from the fund and it was effectively shut down.

In allocating responsibility between Doug and Quin for the financial consequences of Doug's insider trading, the trial court distinguished between the SEC case and the criminal case. It ruled that the community was responsible for all the costs associated with the SEC enforcement action: the $935,306 civil penalty Doug paid to the SEC, along with the legal fees and costs attributable solely to Doug's defense of that action, which it determined

---

precise amount of money the community received as a result of Doug's insider trading.

25

was $290,608.63 of the $9.7 million he spent.[11]  By contrast, it ruled that all the costs associated with the criminal case were Doug's sole and separate obligation, which included the $250,000 criminal fine and the $9,423,596 in attorney fees and costs he incurred in defending that action.

The trial court opined, "the spouse who knowingly commits a crime willfully accepts the risk that he will be caught and have to face the consequences, whereas the spouse who was unaware of the risk and could do nothing to avoid it should not bear the same burden."  We could not agree more.

### B.  Standard of Review

" ' "Appellate review of a trial court's finding that a particular item is separate or community property is limited to a determination of whether any substantial evidence supports the finding."  [Citations.] [¶] But de novo review is appropriate where resolution of "the issue of the characterization to be given (as separate or community property) . . . requires a critical consideration, in a factual context, of legal principles and their underlying values, [such that] the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law." ' [Citation.]"  (*In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 152.)

### C.  Characterization of the Debts Arising from Doug's Insider Trading

Throughout the parties' briefing in the trial court and initially on appeal they treat the relevant statutes as secondary and focus much of their

---

[11]  The amount the trial court allocated to fees and costs for the SEC enforcement action was based on evidence showing Sidley Austin billed $290,608.63 in fees and costs exclusively for the defense of the SEC matter, finding Doug was "only partially successful in proving the amount of fees expended on the SEC action separate and apart from the criminal action."

argument on the relatively few relevant appellate decisions.[12]  But division of property and debts upon dissolution is, first and foremost, governed by statute.  As Doug acknowledges, the Family Code specifies that, "Except . . . as otherwise provided in this division [7]" of the Family Code, which governs property division (or an agreement between spouses), community property must be divided "equally."  (§ 2550.)  Therefore, trial courts have no discretion to divide the community estate unequally unless authorized by a provision in Division 7 of the Family Code to do so.  (See *In re Marriage of Peterson* (2016) 243 Cal.App.4th 923, 937; see also Hogoboom & King, Cal. Practice Guide:  Family Law (The Rutter Group 2023) ¶ 8:900 ("Hogoboom & King") ["Property division jurisdiction must be exercised in the *manner* provided by Fam. [Code,] § 2500 et seq. . . ."].)

Other provisions in Division 7 of the Family Code qualify the equal division principle of section 2550, including provisions that specifically address debt.  It is to those provisions we now turn.

## 1. Under the Plain Language of the Relevant Statutes, the Civil Penalties, Criminal Fine and Attorney Fees Were Doug's Separate Obligations.

### a.  The Statutes

Section 2551 requires trial courts, for "purposes of division and in confirming or assigning the liabilities of the parties for which the community estate is liable," to "characterize liabilities as separate or community and confirm or assign them to the parties in accordance with Part 6 (commencing with Section 2620)."  As the leading practice guide states, "*Characterizing* the status of property interests as 'community' . . . or 'separate' property is the

---

[12] We requested supplemental briefing asking the parties to address the relevant statutes more specifically.

27

foundational starting point for the resolution of marital property rights *and obligations.* 'Characterization must take place in order to determine the rights and liabilities of the parties with respect to a particular asset or obligation and is an integral part of the division of property on marital dissolution.' " (Hogoboom & King, *supra*, ¶8:30; see § 2551, second italics added.)

As a general rule, "the community estate is liable *for a debt incurred by either spouse before or during marriage,* regardless of which spouse has the management and control of the property and regardless of whether one or both spouses are parties to the debt or to a judgment for the debt." (§ 910, subd. (a), italics added.) The general rule has a proviso, that it applies "[e]xcept as otherwise expressly provided by statute." (*Ibid.*)

Under the Family Code, "Debt" is defined as "an obligation incurred by a married person before or during marriage, whether based on contract, tort, or otherwise." (§ 902.) The Code further specifies when debts are "incurred": a debt arising because of a contract is incurred when the contract is made (§ 903, subd. (a)); a debt arising from a tort is incurred "at the time the tort occurs" (*id.,* subd. (b)); and all other debts are incurred "at the time the obligation arises." (*Id.,* subd. (c)).

Under section 2620, "The debts for which the community estate is liable which are unpaid at the time of trial, or for which the community estate becomes liable after trial, shall be confirmed or divided as provided in this part." Further, section 2626 authorizes the trial court to "order reimbursement in cases it deems appropriate for debts paid after separation but before trial."

28

Several statutes in Part 6 of Division 7 of the Family Code address characterization and division of debts, three of which are potentially relevant here.

First, section 2625 states: "Notwithstanding Sections 2620 to 2624, inclusive, all separate debts, including those debts incurred by a spouse during marriage and before the date of separation that were not incurred for the benefit of the community, shall be confirmed without offset to the spouse who incurred the debt." Section 2625 thus requires a trial court to determine whether a debt incurred during the marriage is a separate debt, and if it is separate, to confirm it without offset to the spouse who incurred it. Section 2625 makes clear that a debt "*not incurred for the benefit of the community*" is a separate debt that "shall be confirmed without offset" to the spouse who incurred it during the marriage.

Second, section 2627 provides in relevant part, "Notwithstanding Sections 2550 to 2552, inclusive, and Sections 2620 to 2624, inclusive, . . . liabilities subject to paragraph (2) of subdivision (b) of Section 1000 shall be assigned to the spouse whose act or omission provided the basis for the liability, without offset." Section 1000, subdivision (b)(2), addresses "the liability of a married person for death or injury to person or property" that "is not based upon an act or omission which occurred while the married person was performing an activity for the benefit of the community." Under section 2627, then, liability for "death or injury to a person or property" that resulted from an act or omission of one spouse is a separate debt if it was *not* based on an act or omission that occurred while performing an activity for the benefit of the community.

Notably, sections 2625 and 2627 both address debts or liabilities incurred by one spouse during the marriage, but they are distinct.

29

Section 2625 broadly defines *debts incurred during the marriage* that were "*not incurred for the benefit of the community*" as separate debts. Section 2627 is narrower. It addresses *the liability of a married person "for death or injury to person or property"* and requires the liability to be assigned to the person whose act or omission provided the basis of the liability, without offset, *if the liability is "not based upon an act or omission which occurred while the married person was performing an activity for the benefit of the community*." (§ 1000, subd. (b)(2), italics added.) Unless a debt or liability of a married person is "for death or injury to person or property" within the meaning of sections 2627 and 1000, it is not governed by section 2627 and must be analyzed under the more general provisions of section 2625.[13]

Finally, section 2623 addresses debts incurred "*after* the date of separation but before entry of a judgment of dissolution of marriage or legal separation of the parties." (Italics added.) It states in relevant part, "(a) Debts incurred by either spouse for the common necessaries of life of either

---

[13] The parties disagree as to whether the debts are a "liability for death or injury to person or property" within the meaning of section 1000, subdivision (b)(2).

Quin argues they are because insider trading causes harm to the investing public.

Doug argues they are not. He asserts that although injured investors might have sued to recover compensation for actual losses, that did not happen here.

We agree with Doug. The fact that his actions might have caused property injury to individual investors does not mean that the specific debts he was required to pay represent a "liability" for any such injury (rather than, for example, a fine or punishment). Indeed, Quin concedes that the criminal charges and the SEC action were brought to vindicate public interests not the interests of private parties. We elaborate further below.

30

spouse or the necessaries of life of the children of the marriage for whom support may be ordered, in the absence of a court order or written agreement for support or for the payment of these debts, shall be confirmed to either spouse according to the parties' respective needs and abilities to pay at the time the debt was incurred. [¶] (b) Debts incurred by either spouse for nonnecessaries of that spouse or children of the marriage for whom support may be ordered shall be confirmed without offset to the spouse who incurred the debt." Section 2623 thus requires the court to confirm any post-separation debts not incurred for the necessaries of that spouse or children of the marriage "without offset to the spouse who incurred the debt."

The Code treats certain other debts as separate, but the parties do not contend any of those other sections apply here, and we do not address them.[14]

### b. Analysis

Although the parties disagree as to whether the division of the debts incurred as a result of Doug's insider trading must be treated as an all-or-nothing proposition, there are multiple distinct debts here, each of which must be analyzed under the appropriate statute.[15] These include: the

---

[14] See, e.g., §§ 2621 (debts incurred before marriage); 2624 (debts incurred by one spouse after entry of judgment of legal separation or dissolution); see also § 2602 (court may award from party's share amount it determines to have been deliberately misappropriated by the party to the exclusion of the interest of the other party).

[15] The parties clarified their positions about this in supplemental briefing. Doug argues there is "no reason to" evaluate them separately ("because they all arose from a single act"), whereas Quin argues that the court should look at "the matter as a whole" but also ask whether a particular debt was incurred for the benefit of the community. She argues that "While it is necessary to consider the underlying act . . . the Court must also determine whether a specific debt was incurred for the benefit of the community."

31

$935,000 civil penalty incurred in the SEC enforcement action[16]; the $250,000 criminal fine incurred in the contemporaneous criminal action; the attorney fees incurred to defend Doug in the criminal action; and the attorney fees incurred to defend Doug and Whitman Capital in the SEC enforcement action. While the trial court treated the debts relating to the SEC action differently from those relating to the criminal action, it did not, expressly at least, apply the Family Code provisions to ascertain whether *each* debt was a separate or community debt, including whether the debts arose before or after the parties separated or otherwise satisfied the criteria of the relevant statutes. Proper characterization of these debts depends on the resolution of those issues.

The debts for the $935,000 SEC penalty and the $250,000 criminal fine are post-separation debts governed by section 2623. That is because they are neither contract nor tort debts, and therefore under section 903 were incurred "at the time the obligation ar[ose]." (§ 903, subd. (c)). The obligations arose when Doug became obligated to pay them, which happened after the parties separated when the criminal judgment was entered and the SEC settlement took place.[17] (See *U.S. v. Davani* (N.D. Cal., Mar. 22, 2023, No. 04-cr-00224-

---

[16] The penalty amount of $935,000 is in the same amount as the restitution/disgorgement of profits Doug was required to pay. However, the two were separate obligations, each of which he had to pay. Only the penalty is at issue here because, as we have indicated (see fn. 10, *ante,* page 24), Quin withdrew her request for reimbursement with respect to the restitution/disgorgement payment.

[17] The trial in the criminal action resulted in a guilty verdict in August 2012, and in January 2013 the court imposed a prison sentence and ordered Doug to pay a $400 assessment, "forfeiture in the amount of $935,306" and a fine of $250,000. Thereafter, Doug settled the SEC action, with the result was that he paid a $935,306 criminal penalty and was obligated to disgorge $935,306, with the latter being credited dollar for dollar

JSW-1) 2023 WL 2601354, at p. *4 [under section 903, husband incurred debt for criminal restitution when court imposed it as part of criminal judgment, not earlier when he committed criminal offenses].)  We therefore affirm the trial court's decision that the criminal fine and assessment were Doug's separate obligation but reverse its characterization of the $935,000 penalty as a community obligation.

Citing no legal authority, Doug argues all the debts were incurred preseparation, and thus section 2623 does not apply.  He asserts that because his actions constituted a tort, the debts were incurred at the time the tort occurred under section 903, subdivision (b).  We do not agree.  No tort claims were asserted against Doug, and thus no tort debt is at issue.

The criminal fine and civil penalties sought in those actions were not tort remedies; they were in no sense damages to compensate victims of a tort for injuries.  Instead, they were sanctions imposed to punish Doug and to deter him and others from engaging in the crimes for which he was convicted.  "Fines arising from convictions are generally considered punishment." (*People v. Alford* (2007) 42 Cal.4th 749, 757.)  SEC enforcement proceedings, while civil in nature, serve to "prevent and punish more serious securities law violations," to "protect the integrity of the markets" and to "vindicate the public interest."  (*Jones v. S.E.C.* (4th Cir. 1997) 115 F.3d 1173, 1180.)  The imposition of monetary penalties in an SEC enforcement action are "disciplinary" and "intended to discourage and punish legal and ethical

---

by the amount of the criminal forfeiture.  Under section 903, subdivision (c), the criminal fine and the forfeiture were incurred in January 2013, and the civil penalty was imposed as part of the SEC settlement sometime after that. Both of those obligations were incurred after the parties' separation in April 2012.

misconduct." (*Lang v. French* (5th Cir. 1998) 154 F.3d 217, 222-223; see also *Kokesh v. S.E.C.* (2017) 581 U.S. 455, 459 [in 1990, Congress added monetary penalties as additional "enforcement tool[]"].) They are distinct from disgorgement, and are payable directly to the United States Treasury. (See 15 U.S.C., § 78u, subds. (d)(3)(A)(i), (d)(3)(B), (d)(3)(B)(C)(i).) [18] In bringing an enforcement action, the SEC " 'acts in the public interest, to remedy harm to the public at large, rather than standing in the shoes of particular injured parties.' " (*Kokesh,* 581 U.S. at p. 463.)

Doug also argues, in the alternative, that "[t]o the extent the commission of a crime can be considered an 'other case' under section 903[, subdivision] (c)," he "became subject to" the criminal fine and other punishment when he committed the crime and thus "the obligations flowing from those activities were incurred during [the] marriage." Again, we disagree. He became subject to those penalties when sentence was imposed in the criminal case and he settled the charges brought against him by the SEC. Doug's contrary position disregards the federal authority addressing this issue (see *U.S. v. Davani*, *supra*, 2023 WL 2601354, at p. *4; *U.S. ex rel. Simoneaux v. E.I. duPont de Nemours &Co.* (5th Cir. 2016) 843 F.3d 1033, 1040 ["most regulatory statutes . . . impose only a duty to obey the law, and the duty to *pay* regulatory penalties is not 'established' until the penalties are assessed"].) Doug also disregards the statutory text. Unlike the statutory definitions of when a contract or tort debt is incurred, notably absent from the definition of when "other" debts are incurred is any reference to the

---

[18] Private persons who are injured by insider trading may file civil suits against the perpetrator. (*Freeman v. Decio* (7th Cir. 1978) 584 F.2d 186, 191.) Sometimes they are also permitted to join in an SEC action, although there is no evidence that occurred here.

timing of the *conduct* that is the debt's underlying source. (Compare § 903, subds. (a) & (b) with subd. (c).) We find that omission significant. Unlike tort and contract damages, the responsibility for which arises when the tort or breach of contract occurs, imposition of regulatory and criminal fines is discretionary and it is not until that discretion is exercised that the legal liability to pay them arises.

Applying section 2623, then, which addresses *post*-separation debts, the conclusion that these are Doug's separate debts is not even debatable. Under section 2623, debts incurred after legal separation that are not for the necessaries of the spouse or children are separate debts of the spouse who incurred them. (See § 2623.) The parties agree that the criminal fines or civil penalties do not constitute the "common necessaries of life." (See *Direct Capital Corp. v. Brooks* (2017) 14 Cal.App.5th 1168, 1174 ["common necessaries are those that *all* families need (e.g., food, clothing, & shelter)"].) Thus, the trial court correctly treated the criminal fine as Doug's separate obligation but erred in characterizing the civil penalty imposed by the SEC and agreed to by Doug to settle the enforcement action as a community obligation.

The bigger question by far both monetarily and otherwise is the treatment of the attorney fees Doug incurred in both cases. Although the criminal and SEC actions were not filed until February 2012, the evidence suggests Doug retained Sidley Austin to represent him in those matters in or about January 2011, which was during the marriage and before the parties separated in April 2012. Because those debts were contractual, under sections 902 and 903 they were "incurred" when the contract was made, which was during the parties' marriage. Accordingly, the legal fees are pre-separation debts governed by section 2625 and are community debts or

separate debts depending on whether they were "incurred for the benefit of the community." (§ 2625.)[19]

Where, as here, the "benefit to the community" presents a predominantly legal question, it is subject to de novo review. (See *In re Marriage of Nassimi,* 3 Cal.App.5th 667, 684, fn. 31 (*Nassimi*); *In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734.) Having considered the parties' briefing on this issue, including the supplemental briefing, we conclude the arguments present no real factual disputes. Rather, their dispute is fundamentally a question of law, namely, the meaning of the statutory language, "incurred for the benefit of the community." That is a legal question subject to de novo review.

Here, the trial court addressed whether the attorney fees and costs, which it found totaled $9.7 million, were "incurred for the benefit of the community." We quote parts of its discussion here.

"[Doug] focuses on the assertedly enormous monetary benefit the community received from his operation of the Whitman entities, including the profits generated by the offenses of which he was convicted. He further argues that [Quin] is not truly an 'innocent' spouse, because 'in the current environment' the spouse [of] a long-term technology investment manager

---

[19] It should be noted that, Section 2627 does not apply to the attorney fees Doug incurred for the defense in the criminal and SEC actions any more than it did to the penalties, fines and disgorgement remedies imposed in those actions. Attorney fees are not "liabilit[ies] . . . for death or injury to person or property" within the meaning of section 1000, subd. (b) and, by incorporation, section 2627. The attorney fees Doug incurred arose from the contract he entered for counsel to defend him in the criminal and SEC actions. In his supplemental brief, Doug concedes this point.

either knows or should know that the other spouse may eventually be charged with 'insider type trading'. . . .

"The evidence shows that the community did benefit from [Doug's] criminal conduct, in the amount of the $935,306 disgorgement that [Doug] was obligated to pay. [Quin] first asserted then abandoned a claim for reimbursement of this amount. In the Court's view, the evidence also fails to show that [Quin] was aware of [Doug's] criminal conduct. . . .

[¶] . . . [¶]

"Respondent's argument implies that his legitimate investment management activities somehow inevitably led to his conviction of insider trading. In briefing, he devoted attention to distinguishing his conduct from 'bald faced theft', and arguing that his conduct was more like the 'business tort' situation in <u>Hirsch</u> [*In re Marriage of Hirsch* (1989) 211 Cal.App.3d 104 (*Hirsch*)] rather than the 'theft tort' of <u>Stitt</u> [*In re Marriage of Stitt* (1983) 147 Cal.App.3d 579 (*Stitt*)] and <u>Bell</u> [*In re Marriage of Bell* (1996) 49 Cal.App.4th 300 (*Bell*)]. The Court views the purported distinction with skepticism and finds this line of reasoning unpersuasive. Insider trading is not an inevitable consequence of being an investment manager. [Doug] was convicted of a crime requiring willful behavior, not a 'business tort'. His argument attributing 'tens of millions of dollars' of community benefit to his conduct vastly overstates the benefit to the community of the criminal conduct that he asks the community to share in the cost of defending. That benefit was determined to be $935,306."

The trial court's description is apt. Doug argues his operation of the hedge fund in general benefited the community, and there is no question that it did. But section 2625 presents a narrower question. The debts at issue were incurred not by Doug's overall operation of the hedge fund throughout

37

the course of the parties' marriage. Rather, they were incurred because Doug violated the securities law by conspiring to commit and committing multiple acts of insider trading. The question is whether the amounts Doug expended on attorney fees to defend himself in the criminal and SEC cases were incurred for the benefit of the community.

Addressing *that* question requires an understanding of the phrase "incurred for the benefit of the community." Here, the trial court found there was some potential benefit to the community, but it was at most $935,000, the amount of ill-gotten gains the community might have, but ultimately did not, receive had the attorneys succeeded in avoiding liability for disgorgement. As the court also observed, the attorney fees Doug expended to defend against the criminal and SEC actions totaled $9.7 million, which of course dwarfed any potential community benefit. Further, as we shall discuss, the evidence reflects that the primary purposes for which Doug incurred the $9.7 million in fees were not to defend a community asset.

Fundamentally, we do not think the question whether a debt was "incurred" or "not incurred" "for the benefit of the community" within the meaning of section 2625 in all circumstances presents a binary question. As we have said, the Family Code defines "[d]ebt" to mean "an obligation incurred by a married person before or during marriage, whether based on contract, tort, or otherwise." (§902.) The ordinary meaning of both "debt" and "obligation," used in the singular, "a debt" or "an obligation," is a duty or commitment to pay a person or entity.[20] Here, the debt we must address is

---

[20] See Merriam-Webster <https://www.merriam-webster.com/dictionary/obligation> (as of Dec. 29, 2023) ("a commitment (as by government) to pay a particular sum of money" "an amount owed under such an obligation");

Doug's contractual obligation to pay the attorneys who defended him in the two cases.

In some circumstances, a debt may be incurred for multiple purposes some of which are for the benefit of the community and some which are not. For example, funds borrowed on a home equity line of credit used to pay for improvements to the marital home and to cover the college expenses of a child of one spouse from a prior marriage. Family Code section 2556 indicates that unequal allocation of a debt or liability is permissible.[21]

*Marriage of Nassimi, supra*, 3 Cal.App.5th 667 demonstrates that attorney fee debt may be incurred partly for the benefit of the community and partly for non-community purposes. There, the husband incurred attorney fees both to defend himself against claims arising from his operation of a

_____

Britannica Dictionary <https://www.britannica.com/dictionary/debt> (as of Dec. 29, 2023) ("an amount of money that you owe to a person, bank, company, etc."); Cambridge Dictionary <https://dictionary.cambridge.org/us/dictionary/english/debt> (as of Dec. 29, 2023) ("something, especially money, that is owed to someone else"); Dictionary.com <https://www.dictionary.com/browse/debt?adobe_mc=MCMID%3D242594943 35274820210782707502712756703%7CMCORGID%3DAA9D3B6A630E2C2A 0A495C40%2540AdobeOrg%7CTS%3D1703205150> (as of Dec. 29, 2023) ("something that is owed or that one is bound to pay or perform for another: *a debt of $50*").)

[21] Section 2556 specifically addresses division of unadjudicated assets and debts after a judgment of dissolution. In relevant part, it states, "In these cases, the court shall equally divide the omitted or unadjudicated community estate asset or liability, unless the court finds upon good cause shown that the interests of justice require an unequal division of the asset or liability." There is no reason that this principle cannot apply to a debt that is allocated as part of the dissolution where, because the debt was incurred in part for community and in part separate purposes it would not be in the interest of justice to divide it unequally.

community business during the marriage and to pursue a counterclaim that was his separate property. The court held that while the community was responsible for the fees incurred to defend the claims against the former family business, it was not responsible for the fees incurred to pursue the husband's separate property counterclaim. (*Id*. at pp. 694-695.) Ultimately, the court declined to require the wife to reimburse the community for any of the fees because the husband failed to meet his burden to establish the amounts of the fees he incurred for each. (*Id*. at p. 695.)

We need not address all circumstances under which an allocation of debt between the community and the spouse who incurred it may be appropriate. We hold only that where, as here, one spouse, expends an extraordinary sum that is out of proportion to any community benefit for purposes that are predominantly for his or her separate benefit, nothing in Family Code section 2625 requires the court to order the other spouse to share equally in that burden. Here, Doug, incurred a huge debt to defend himself against criminal and civil enforcement actions in an effort to avoid being convicted of serious crimes, being subjected to criminal fines, civil penalties and a substantial prison sentence. Those consequences, which he sought to avoid, were the product of criminal acts he *knew* he had engaged in, and his expenditure of huge sums in an attempt to avoid the consequences served primarily to benefit him, not Quin. Whatever temporary benefit the community may have received from the crimes, the expenditure of more than ten times that amount for attorney fees cannot logically be attributed simply to avoiding repayment of the $935,000 in ill-gotten gains the community had received. The court could infer that the primary reason Doug spent $9.4 million defending himself in the criminal and SEC actions was predominantly to benefit himself, and there is uncontradicted evidence that,

40

far from benefiting the community, Doug's conduct had both monetary and personal consequences that were exceedingly harmful to the community.

While the trial court did not expressly address the statutory interpretation question, it implicitly understood that the attorney fee issue was not a binary one and ultimately arrived at the right conclusion. Rather than treating the "benefit of the community" question as requiring a yes or no answer, the court appreciated that neither Doug's conduct, nor the monetary and other consequences that flowed from it, on balance benefited the community, and its allocation reflects that. It allocated the lion's share of the attorney fees, the $9.4 million Doug expended to defend himself in the criminal action, to Doug as his separate obligation. It allocated a share of the fees expended on the SEC action to the community. While its rationale for that is not altogether clear, we affirm its allocation of $290,000 in fees to the community for reasons we shall explain.

As we have said, the answer to the question whether there was a benefit to the community from Doug's expenditure of $9.7 million to defend the two actions is, "not for the most part," and "on balance, no." In this situation, the statute permits the trial court to allocate the attorney fees between the community and the spouse who incurred them in reasonable proportion to the value of the community and separate benefits the fees were expended to achieve.

As we shall discuss further below, while the trial court did not clearly articulate the rule we interpret section 2625 to embody, it effectively allocated the attorney fee debt in a manner consistent with this opinion. But before we explain why we so conclude and therefore affirm its allocation of $290,000 in fees to the community, we turn to the case law and explain why

41

it does not support the all-or-nothing result the parties suggest should apply in this case.

## 2. The Caselaw Does Not Change the Analysis.

The parties cite several cases involving tort liabilities and debts, which we will discuss. We focus first on the three California cases that have addressed the allocation of financial responsibility for debts resulting from one spouse's *criminal* misconduct for purposes of property division upon dissolution. (See *Bell, supra,* 49 Cal.App.4th 300; *In re Beltran* (1986) 183 Cal.App.3d 292 (*Beltran*); *Stitt, supra,* 147 Cal.App.3d 579.) Although the cases differ somewhat in their analytical approaches, in two, the innocent spouse was held to have no financial responsibility for the resulting losses. (See *Stitt*, at pp. 582, 586-588 [wife who embezzled from employer held solely responsible for attorney fees incurred in civil and criminal cases]; *Beltran*, at pp. 293-295 [convicted child sex abuser held solely financially responsible for military pension benefits the community forfeited due to his crimes].) The third reached a split result, holding the community was responsible only for repaying the victim for the ill-gotten gains to the community and not responsible for any of the resulting legal fees, tax liabilities or penalties. (See *Bell*, *supra*, at pp. 308-310 [where wife embezzled from her employer, community held responsible only for repaying embezzled funds used to benefit the community and wife held separately responsible for all legal fees incurred to defend civil and criminal cases and for tax liabilities including tax penalties].)

In *Stitt,* the wife embezzled from her employer. Her obligation to repay her employer for the embezzled funds was not at issue, apparently because the statute governing *liabilities* of spouses, then Civil Code section 5122, required the employer to look first to the wife's separate property to satisfy

42

that obligation and it had done so.  (*Stitt, supra,* 147 Cal.App.3d at pp. 582, 583-584, 587-588.)  The only issue was whether the wife had to reimburse the husband for attorney fees paid using community assets to defend the wife in the civil and criminal proceedings.  (*Id*. at p. 586.)  The court held the attorney fee debts were separate debts of the embezzling wife for which her the community was entitled to reimbursement.  (*Id*. at p. 582.)  It based its conclusion on equitable principles, and a "legislative direction" it discerned from section Civil Code 1714, subdivision (a),[22] and subdivision (a) of former section Civil Code 5122 (current Family Code section 1000)[23] that the mere fact of marriage should not change the usual rules of personal responsibility

[22] Civil Code section 1714, subdivision (a), provides in relevant part, "(a) Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."

[23] Former section 5122 provided in subdivision (a), "A married person is not liable for any injury or damage caused by the other spouse except in cases where he or she would be liable therefor if the marriage did not exist." (Former Civ. Code, § 5122; Stats. 1984, ch. 1671, § 11, p. 6023.)  It then went on in subdivision (b) to address the liabilities of spousal property to victims of a spouse's torts, requiring that if the liability was based on an act or omission while the tortfeasor spouse "was performing an activity for the benefit of the community," it would first be satisfied from community property and second from the separate property of the tortfeasor spouse, and that if the liability was not based on such an act or omission it would be satisfied first from the separate property of the tortfeasor spouse and second from the community. (*Id*., subd. (b); see *Stitt, supra*, 147 Cal.App.3d at p. 587.)  Family Code section 1000 retains the same provisions.  As the court in *Stitt* recognized, although section 5122, subdivision (b), exposed the husband's community property to the tort liability, including apparently, the attorney fees, that section was not determinative of the division of the debt as between the spouses themselves.  (See *Stitt,* at pp. 587-588.)

43

for the consequences of criminal or tortious activity.  (*Stitt,* at p. 588.)  It concluded, "No principle of law required the innocent spouse to share the loss created by the other party. . . .  Therefore it was proper for the court to make orders which carried out the law's intention that only responsible participants in crime or tort bear the loss."  (*Id.* at p. 588.)

In *Beltran,* an army colonel was convicted of lewd and lascivious acts on a child, court-martialed for that crime, "dismissed from the Army and stripped of all military benefits, including his pension and accrued leave." (*Beltran, supra,* 183 Cal.App.3d at p. 294.)  The trial court found the portion of the pension and the leave amounts that accrued during the marriage were community property, charged the husband with constructive receipt of those community assets and then "equalized" the community property by requiring the husband to pay half of the combined amount ($59,230) to his wife.  (*Ibid*.) Relying on *Stitt*, it reasoned, "husband's criminal conduct diminished the wife's share of the community property to which the wife was otherwise entitled upon dissolution.  [Citation.]  In our view, wife should not be made in effect to share in a penalty imposed upon husband for his criminal conduct. We accordingly conclude as a matter of equity that criminal conduct on the part of husband which directly caused forfeiture of pension benefits justified the trial court's conclusion that wife was entitled to reimbursement for her share of such lost community property."  (*Beltran,* at p. 295.)

Neither *Stitt* nor *Beltran* discussed or expressly applied the statutory provisions governing characterization and division of debts on dissolution that we have cited,[24] because those provisions were not in effect at the time

---

[24]  *Stitt* cited and discussed former section 5122 of the Civil Code, which has been recodified as section 1000 of the Family Code.  (Stats. 1992, ch. 162, § 10.)  That section, as the court in *Stitt* recognized, "spells out the order in

those cases were decided.[25]  Both applied equitable principles and principles gleaned from other statutes. (*Stitt*, 147 Cal.App. 3d at p. 587-588; *Beltran*, 183 Cal.App.3d at p. 295.)  In neither case was the spouse's criminal conduct shown to have benefited the community at all.  And *Beltran* did not involve a claim of reimbursement for attorney fees.  For these reasons, neither *Stitt* nor *Beltran* is dispositive.

In *Bell*, the wife embezzled funds from her employer, was arrested and subsequently convicted, and in the meanwhile was sued along with her husband by her former employer to recover the embezzled funds.  (*Bell*,

---

which creditors may satisfy tort claims from the property of the spouses, [but] it does not forbid one spouse from later disclaiming responsibility for the tort liability of the other in a dissolution proceeding." (*Stitt*, *supra*, 147 Cal.App.3d at p. 588.)  It also discussed former Civil Code section 5116, which is a predecessor of current Family Code section 910. (*Stitt*, at p. 588.)  Section 910, on which Doug relies in his combined appellant's reply and cross-respondent's brief, likewise addresses the liability of the community estate for debts, not the rights of spouses as between themselves. (See *Stitt*, at p. 588; § 910.)

[25]  Family Code section 2623 (post-separation debts) was adopted in 1992 but "continues former Civil Code Section 4800(c)(3) without substantive change."  (23 Cal.L.Rev. Comm. Reports 1 (1993), reprinted in West's Ann. Fam. Code (2023) foll. § 2623, p. 70.)  Former section 4800, subdivision (c)(3), was adopted in 1986.  (See 1986 Stats., ch. 215, § 1, pp. 1145-1146.)

Family Code section 2625 (pre-separation separate debts) "continues former Civil Code Section 4800(d) without substantive change." (23 Cal.L.Rev. Comm. Reports 1 (1993), reprinted in West's Ann. Fam. Code (2023) foll. § 2625, p. 74.)  Former section 4800, subdivision (d), also was adopted in 1986.  (See 1986 Stats., ch. 215, § 1, p. 1146.)

Family Code section 2627 (educational loans, liabilities for death or injury) "continues former Civil Code Section 4800(b)(5) without substantive change" (23 Cal.L.Rev. Comm. Reports 1 (1993), reprinted in West's Ann. Fam. Code (2023) foll. § 2627, p. 80), which also was adopted in 1986.  (See 1986 Stats., ch. 215, § 1, p. 1145.)

*supra*, 49 Cal.App.4th at pp. 302-303.) The parties settled the civil suit for $150,000. (*Id.* at p. 303.) The wife showed she had used the embezzled money for community purposes, including investing in certificates of deposit, depositing them in joint bank accounts and giving her husband a monthly allowance and gifts. (*Id.* at pp. 303-304.) The husband knew nothing of the embezzlement until she was arrested, and he and his wife subsequently separated. (*Id.* at p. 303.)

The trial court had held *all* the debts resulting from the embezzlement, including the restitution-based settlement with her former employer, were separate debts of the wife. (*Bell, supra*, 49 Cal.App.4th at p. 307.) It focused on the fact that the wife had engaged in criminal, not merely tortious, activity and that " 'in the long run . . . this didn't benefit the community. It destroyed it.' " (*Id.* at p. 306.)

The Court of Appeal disagreed with the trial court that the $150,000 restitution-based settlement amount was the separate debt of the wife, because there was "uncontradicted testimony that the community received the benefit of the embezzlement" and "that all the embezzled funds had been put to community, and not separate, use." (*Bell, supra*, 49 Cal.App.4th at p. 310.) The court concluded, "directing payment of the settlement by the community would do no more than bring it back to where it had been." (*Ibid.*)

However, the appellate court in *Bell* reached a different conclusion regarding "the attorney fees required for [the wife's] defense in both the civil and the criminal actions" and "the state and federal tax liability arising out of the embezzlement, including interest and penalties." (See *Bell, supra*, 49 Cal.App.4th at p. 309.) It affirmed the trial court's characterization of those obligations as the wife's separate debts, reasoning that she had "engaged in intentional tortious and criminal activity and knowingly accepted

46

the risk that she would be caught and would have to face the consequences" and that "Husband, who knew nothing of the risk and could do nothing to avoid it, should not in fairness bear the same burden once it did go wrong." (*Ibid.*) In so holding, it relied in part on *Stitt*. (*Ibid.*)

*Bell* is consistent with the statutes governing division of debts in that it did not treat all the financial consequences of the wife's crime as a single debt. Instead, it evaluated each obligation separately. Because there was *no* evidence that the funds the wife had embezzled were used for anything other than the benefit of the community, it reversed the trial court's characterization of the debt for repayment of those funds (i.e., the civil settlement) and held the debt was a community obligation. It in essence affirmed the trial court's conclusion that because wife's embezzlement overall did not benefit, but destroyed, the community, the expenditures for attorney and accounting fees in defense of the civil or criminal actions and the state and federal tax liability imposed on the wife in the criminal case should be treated as wife's separate debts.

In this case, we have applied section 2625 and, as the court did in *Bell*, evaluated the different debts and obligations incurred because of Doug's crime separately, determining when each was incurred, and for those incurred during the marriage, whether each such debt benefited the community. Because Quin abandoned her contention the forfeiture/disgorgement payment was Doug's separate obligation, we do not review the trial court's findings on that issue. (See p. 24 & fn. 10, *ante*.) However, we note that much as in *Bell*, the trial court here did *not* find that the community was benefited significantly from the attorney fees incurred in either the criminal action or the civil enforcement action or by the criminal fine or civil penalties judgment. In that respect, *Bell* supports Quin's

argument and undermines Doug's.  The only difference between this case and *Bell* is that here, the trial court implicitly found the attorneys' fees conferred *some* benefit on the community, albeit a limited one, because they were incurred in part to defend the community from liability for the ill-gotten gains the community received as a result of Doug's acts.  In light of that, we will not reverse its allocation of a proportionate share of the fees ($290,000) to the community.  But for the reasons we have discussed in Part II.C.1 of this opinion, we do not interpret the statute to preclude allocation of the lion's share of the fees to Doug where outsized fees he incurred were predominantly for his own personal benefit.

Doug relies on *Hirsch, supra,* 211 Cal.App.3d 104, which criticized *Stitt* (*Hirsch,* at p. 110), and on *Nassimi*, *supra,* 3 Cal.App.5th 667.  He contends they stand for the proposition that if the criminal activity "substantially benefited the community," then "attorney's fees and costs incurred in defense are a community obligation."

In *Hirsch*, the parties had separated and the trial court had entered an interlocutory decree of divorce when the husband was sued for conduct arising from his service, during the marriage, on the board of a bank which had subsequently collapsed.  (*Hirsch, supra,* 211 Cal.App.3d at p. 106.)  The suits alleged violations of statute, breach of contract, negligence and intentional misconduct.  (*Ibid*.)  The husband settled all three suits and then sought an order in the dissolution case to characterize the settlement amounts he had paid and the defense costs he had incurred as community property and to reimburse him for half those amounts.  (*Ibid*.)  The trial court ruled the liabilities were husband's separate responsibility because his conduct had been tortious.  (*Id*. at p. 108.)  The Court of Appeal reversed**,** concluding the evidence showed the husband's conduct benefited the

48

community and his exposure to liability arose out of his actions as a director which took place for the most part during the parties' marriage. (*Id.* at p. 111.) There was no evidence that his service on the board was to protect his separate property or to further any other separate property interests. (*Ibid.*)

*Hirsch* did not treat the liability and the attorney fee obligations as separate debts or analyze each accordingly, and to that extent we disagree with its approach. However, we do not quarrel with the result in that case because there, unlike here, the defense of the litigation was not undertaken to advance any non-community interests. *Hirsch* did not address the question we address here, in which the defendant engages in criminal conduct that entails huge risk of harming the community and incurs fees disproportionate to any potential community benefit to protect himself from punitive repercussions for which he alone is responsible. Indeed, as *Hirsh* recognized, "intentional torts and crimes rarely benefit the community." (*Hirsch, supra,* 211 Cal.App.3d at p. 110, fn. 8.)

Likewise, Doug cites *Nassimi*, *supra*, 3 Cal.App.5th 667. In that case, the husband allegedly defrauded a third party to buy the family business by concealing the fact that its products did not comply with federal regulations. (*Id.* at pp. 672-673, 676, 693 & fn. 37.) After the parties separated, the buyer sued the husband for breach of contract and misrepresentation, seeking to rescind the transaction, and the husband eventually settled the case. (*Id.* at pp. 676, 677.) A rescission would have meant the community had to repay as much as much as $16 million it had already gained in proceeds from the sale, and the husband had spent about $1.1 million on attorney fees and costs and reached a settlement of $2 million. (See *id.* at 672-673, 679-680.) *Nassimi* held both the settlement payment and the husband's attorney fees were a

49

community debt because the underlying sale of the business had yielded millions of dollars in profit to the community, which was a benefit to the community. (See *id*. at pp. 684-687, 693-694.) *Nassimi* cited *Hirsh* for the proposition that "separated spouses are obliged to share in the costs of defending lawsuits threatening community assets." (*Nassimi,* at p. 686.) As a general proposition, we do not disagree, but insofar as Doug reads it as advancing a categorical rule that if there is *any* community benefit there must be an equal division of the spouses' obligations, no matter how excessive in relation to that benefit, *Nassimi* no more supports that proposition than *Hirsch*. Neither involved a situation like this case and *Bell,* in which the spouse engaged in criminal conduct with a risk of negative repercussions for the community that far outweighed any potential benefit, from either the conduct itself or, in this case, from the expenditure of outsized attorney fees that served, primarily, the interests of that spouse alone.

In short, none of the case law changes our analysis.

### 3. The Trial Court Exercised Its Discretion in This Case.

While the trial court did not clearly explicate the rules it was applying in allocating the attorney fees and costs, it considered the relevant factors and exercised discretion in an appropriate way by allocating none of the criminal fees, and a relatively small portion of the fees spent on the SEC enforcement action, to the community.

The portion of the SEC enforcement-action fees the trial court allocated to the community were those Doug had demonstrated were "expended on the SEC action separate and apart from the criminal action." It prefaced that by interpreting *Nassimi* to "suggest[] that it would be appropriate for the community to *share* in the attorney's fees and costs for defending the SEC action." (Italics added.) It had already determined that the criminal conduct

50

had benefited the community in the amount of $935,000, the ill-gotten gains Doug was later required to disgorge. It recognized that in "attributing 'tens of millions of dollars' of community benefit to his conduct" Doug had "vastly overstate[d] the benefit to the community of the criminal conduct that he asks the community to share in the cost of defending" and reiterated "[t]hat benefit was determined to be $935,306."

The trial court also found that in defending against the criminal and civil actions, Doug spent $9.7 million. It implicitly recognized this was grossly out of proportion to any tangible benefit the community derived. Although the court did not expressly so find, the record also reflected that Doug alone controlled the Whitman entities and the parties' interests in them and he alone chose to spend $9.7 million to defend the two actions. Based on the facts, the court concluded it was appropriate for the community to "share" in the defense costs of the SEC action in the amount of $290,000. Ultimately, the trial court exercised its discretion in a manner consistent with this opinion by allocating an amount of attorney fees and costs that was proportionate to the limited community benefit at stake in that litigation.

For the foregoing reasons, we affirm the trial court's characterization of the debts incurred as a result of Doug's criminal conduct, except to the extent the trial court characterized the SEC penalty as a community obligation. Like the criminal fine, that penalty was incurred after the parties separated, it was not to repay any obligation of the community, and it is Doug's sole obligation to bear.

## III.
### *Attorney Fees Incurred by the Hedge Fund*

After the hedge fund intervened below, Doug used approximately $1.3 million of his own separate property to pay its legal fees and then sought

51

reimbursement of them as a community expense. Over Quin's objection, the trial court ordered Quin to reimburse Doug for half of that amount ($640,996.18).

Quin now challenges that ruling on two grounds. She argues the court erred because it applied the wrong legal standard. She also argues the court erroneously failed to rule on her request for an accounting of all of the hedge fund's legal fees. Quin's arguments are not very focused, and we conclude she has not demonstrated the court erred.

## A. Background

In April 2012, about 11 days after Doug was served with the petition for legal separation, Quin sought an order for an accounting of all community funds spent by Doug and freezing all community assets including those of Whitman Capital and Whitman Partners. She testified she did this in order to gain transparency over the legal expenses that were being incurred by those entities for Doug's defense of insider trading charges, because Doug was being secretive about it. Doug was concerned this would prevent the hedge fund from making any distributions to limited partners. The matter was resolved by stipulation in June 2012, permitting the hedge fund to pay its regular operating expenses and legal fees relating to the criminal and SEC actions, and giving Quin access to some financial information concerning the hedge fund (audits and monthly statements).

Quin then issued subpoenas to numerous financial institutions with whom the fund had business relationships, including trading partners, its prime broker, investment banks and the fund's independent accounting auditor.

In April 2013, Quin filed a request asking for the appointment of a receiver to take over the fund and either wind it down or freeze all business

52

accounts, premised on claims Doug had breached his fiduciary duty. Doug testified about the consequences this would have had on the business, including preventing distributions to investors, severing the fund's banking relationship, and triggering investor lawsuits. He also testified that the appointment of a receiver would be expensive, and that liquidating the fund would have forgone lucrative profits and also would have triggered about $15 million in immediate tax consequences for him and Quin.

Doug felt Quin's actions were damaging the fund. In addition to her request for a receiver, he was concerned that her subpoenas were impairing the privacy rights of the fund's investors (by seeking information about their identities) and also "destroying" the fund's business relationships. So he decided the partnership should intervene.

On June 11, 2012, it was granted leave to do so, and sought declaratory relief touching on a wide range of issues relating to discovery Quin was attempting to undertake in the case (including from the hedge fund itself), the appointment of a receiver, the confidentiality of its investors' identities and investment activity, and corporate governance issues.

The fund participated extensively in the proceedings. It opposed Quin's attempts to freeze or wind down the business, and the trial court found it was successful in that regard.[26] It also attempted to limit Quin's efforts to

---

[26] In September 2014, the court deferred a ruling on Quin's request for a receiver and instead appointed two independent monitors to oversee all of the fund's business operations. The monitors had full and complete access to the fund's business records and were required to submit monthly reports concerning all of its expenses, activities and dealings, accompanied by a voluminous and exhaustive set of supporting documentation and detail, down to the very last trade confirmation. They were charged with reporting any irregularities, financial discrepancies or concerns about the fund's operations, and they also had to approve any payments or transactions not in the

procure discovery, which the trial court found was a major focus of litigation. The court found that the discovery battles were not one-sided, and that although the fund's motions to quash Quin's subpoenas to various financial institutions were denied, the fund succeeded in securing protective orders in connection with the subpoenas, and "[n]either party appears to have achieved unqualified success in their discovery litigation." The court also found the fund took reasonable measures to protect the privacy rights of its limited partners, and that Quin's opposition to those measures was "excessive." In addition, the fund joined sides with Doug to litigate other issues that had little, if anything, to do with protecting its legitimate business interests.[27]

Beginning in December 2013, Doug began using his own separate funds to pay the fund's operating expenses because the fund's cash had been depleted. As noted, he then sought reimbursement for $1.2 million in legal fees he paid relating to the fund's intervention in the case, on the ground they were used to preserve a community asset and were reasonable and necessary. Quin asked for an accounting of all of the fund's legal fees and for an order requiring them to be reimbursed to the community. The trial court granted Doug's request and ordered Quin to reimburse him 50 percent of the fees he paid from his separate property funds ($640,996.18). It denied Quin's request for an accounting.

---

ordinary course of business, which included any payment of attorney fees or costs and any distributions to Doug. The fund later filed a motion to terminate the monitors, but it was denied. After the monitors were appointed, Quin still sought to have a receiver appointed to wind the business, which ultimately did not happen.

[27] Most notably, for example, the trial court found it actively opposed Quin's efforts to shift responsibility for its own legal fees to Doug. Other examples are detailed in Quin's briefing.

## B. Doug's Request for Reimbursement

Quin argues, first, that the court applied the wrong legal standard in ruling on Doug's reimbursement request. She contends it applied the rule governing reimbursements *to the community* rather than the rule governing reimbursements *to a paying spouse*. She argues that in ruling on Doug's request to be reimbursed, the court should have, but did not, consider whether Doug proved that the fund's intervention benefitted the community. In support of this contention, she relies on a portion of the statement of decision in which the trial court stated that the evidence did not "support[] [Quin's] allegation that the [fund's] attorney's fees were incurred for [Doug's] personal benefit nor that they represent waste in the management of a community asset."

We are not unsympathetic to Quin's fundamental point, which is that she was forced to finance the legal expenses of an entity that was aligned to a very large degree with her husband in these divorce proceedings, and joined with him to engage in expensive litigation against her. Nevertheless, Quin has not presented an intelligible legal argument for reversal.

In the first place, we agree with Doug who asserts that Quin misreads the trial court's decision. As Doug points out, the trial court made specific factual findings that the fund's intervention and litigation activities were necessitated in part by Quin's attempts to liquidate and wind it down, which threatened the very existence of that income-producing community asset. Under the principles discussed in connection with the court's findings about the $900,000 withdrawal, here again we must liberally construe the court's factual findings to support the judgment, and also infer the court made every factual finding necessary to support its decision. (*Ciprari*, *supra*, 32 Cal.App.5th 83, 94; *Gajanan Inc. v. City and County of San Francisco*,

55

*supra,* 77 Cal.App.5th 780, 792.) In light of these other findings about the necessity of intervention to keep the fund alive and operable, the portion of the statement of decision that Quin attacks—i.e., the court's observation that *she* failed to prove that the legal fees were incurred for Doug's personal benefit—is at best ambiguous. But Quin did not object to the statement of decision. Therefore, here again, we must resolve all ambiguities in favor of the court's judgment. (See *Arceneaux*, *supra*, 51 Cal.3d 1130, 1136; Code Civ. Proc., § 634). Doing so, we interpret the decision as encompassing a finding that the legal fees *were* incurred for the community's benefit and that Quin's evidence simply did not persuade the court to conclude otherwise. Under the principles governing our review of a judgment based on a statement of decision issued after a bench trial, Doug's assertion the court found the fund's legal fees "benefitted the community rather than Doug personally" is correct. That finding refutes Quin's argument that the court misapplied the law in this regard.[28]

Second, Quin's argument that the court should have "requir[ed] Doug to prove the expenses he voluntarily paid were incurred for the benefit of the

---

[28] For the same reason, we also reject Quin's argument that the court erroneously granted Doug's request for reimbursement under "the rule in *In re Marriage of Czapar* (1991) 232 Cal.App.3d 1308, 1318, that courts may order reimbursement to the community when a spouse who has management of a community asset abuses his right of management and control." Indeed, in context it appears the court's observation pertained to Quin's separate request that *the community* be reimbursed for all legal fees and costs the fund had incurred since November 15, 2017. Citing the standard applied in *Czapar*, the court found that those legal fees were not incurred for Doug's personal benefit nor represented waste in the management of a community asset, thereby denying Quin's request for Doug to reimburse the community. That ruling in no way infects with error the court's adjudication of *Doug's* request for reimbursement *from* the community.

56

community" is new. Doug does not dispute that the applicable legal standard entails proof of a community benefit. But nothing in the record indicates that Quin asserted it was *Doug's* burden to prove that, rather than her burden to disprove it. Nowhere in her closing trial briefs or new trial motion did she say this. In fact, her trial court papers addressing this issue do not contain any discussion of the law governing reimbursement claims. For the most part (other than ancillary legal points), her trial court papers just argued *the facts*.[29] The court cannot be faulted for allegedly misapplying the law when the law was not brought to its attention. (See *Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603 [" 'issues not raised in the trial court cannot be raised for the first time on appeal' "]; cf. *California Building Industry Association v. State Water Resources Control Board* (2018) 4 Cal.5th 1032, 1050 [burden of proof issue forfeited].) " 'Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier.' " (*Green v. Healthcare Services, Inc.* (2021) 68 Cal.App.5th 407, 419.)

## C.    Quin's Request for an Accounting

Next, Quin argues the court failed in its statement of decision to rule on her request for an accounting of the fund's post-separation legal fees and requests a remand for the court to decide that issue. We agree with Doug that this contention is forfeited because she did not file any objections to the

---

[29] Below, Doug cited no law in support of his request for reimbursement of these expenses, and Quin just argued the equities. The same was true in her motion for a new trial, where she argued only that it was "inherently unfair" to require her to pay those legal fees. And Doug cited no law in opposition to that aspect of her new trial motion.

statement of decision or move for a new trial on that basis. When a party fails to bring a defect in the statement of decision to the trial court's attention, we infer that the trial court resolved the issue in favor of the prevailing party. (See, e.g., *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 896-897.) "It is clearly unproductive to deprive a trial court of the opportunity to correct . . . a purported defect by allowing a litigant to raise the claimed error for the first time on appeal." (*Arceneaux*, *supra*, 51 Cal.3d at p. 1138.)

In addition, the court did address her request for an accounting. The court expressly denied the request, albeit without analysis. In her reply brief, Quin acknowledges this, stating that "[a]lthough the court denied [her] request for an accounting, it made no factual and legal findings on the issue." She then pivots and argues instead that the court failed to provide a legally sufficient statement of decision on this issue. But that contention is twice forfeited: both because she never raised this asserted deficiency in the trial court and because the argument belonged in her opening brief. [30] (See *Herrera v. Doctors Medical Center of Modesto* (2021) 67 Cal.App.5th 538, 548 [" 'It is elementary that points raised for the first time in a reply brief are not considered by the court' "].)

---

[30] Her contention in the reply brief that she brought the deficiency to the court's attention simply by *moving* for a new trial is not well-taken. Although her new trial motion addressed Doug's claim to be reimbursed for the fund's legal fees, it did not raise any issue about the sufficiency of the statement of decision concerning that or any other issue.

### *Sale of the Faxon Property*

#### A.    Background

In November 2012, the parties stipulated to work together to sell their high-end, luxury home on Faxon Road in Atherton, California ("Faxon") "forthwith."  They signed a listing agreement on May 15, 2013, listing it for sale at a price of $25 million, and Quin concedes that, although she thought that listing price was too high, she "initially chose to go along with" it.  The home ultimately sold about three years later in February 2016 for $16.5 million.

There was a tremendous amount of litigation over the sale of Faxon, and the asking price was reduced several times.  After several months of marketing the property at $25 million, the original listing agent recommended dropping the price to $20.1 million.  Doug declined, because he disagreed with the agent's assessment the property had been adequately advertised in foreign markets.  When the property was listed at $25 million, the couple received two offers for $18 million, one of which was increased to $18.75 million in February 2014, and neither of which was accepted.[31]  Quin testified she wanted to accept the $18.75 million offer but Doug refused.  But she also vaguely recalled that her lawyer at the time wanted her to counter it.  By then, Quin had secured an appraisal valuing the property at $18.5 million.

The initial listing agreement had expired the previous November, however, and so in March 2014, the court appointed two co-listing agents who

---

[31]  Quin sought an order requiring the parties to accept an $18 million offer which the court denied.

were to "determine the appropriate listing price" together (otherwise, the court would do so). The court-appointed agents set the price at $22 million. After a few months of receiving no offers, they recommended lowering the price to $19.8 million (in July 2014). Quin agreed but Doug refused.

Finally, at Quin's request, the court appointed a receiver in February 2015 with full authority over the sale, including sole authority to determine its asking price. The receiver's agent listed the property in April 2015 for $20.7 million. He later turned down (and countered) several offers in the $16 to $17 million range, before ultimately accepting the $16.5 million offer.

Below, Quin asserted that Doug breached his fiduciary duty to her by delaying and hindering the sale of Faxon, including by insisting on an inflated asking price and by refusing to accept reasonable offers on the property. The trial court rejected her claim in an eight-page portion of its statement of decision. The court found that Doug "steadfastly rebuffed every recommendation of real estate agents to lower the list price," made no findings about what a reasonable price would have been (and when), found that "*both* parties participated in an amount of litigation over [the] sale of Faxon that the Court finds excessive" (italics added), and found that Doug's conduct did not breach his fiduciary duty. She now appeals, arguing that the undisputed evidence establishes that he did, by refusing reasonable offers on the property and insisting on an inflated asking price against brokers' recommendations, all of which resulted in a $2.25 million loss (measured, presumably, by the highest offer that was not accepted, i.e., $18.75 million) plus two years of property taxes and other expenses.

60

## B. Standard of Review

Our standard of review is more stringent than either party acknowledges. Quin argues we must review this question de novo because the facts are undisputed, and Doug asserts it is a substantial evidence question. But Quin bore the burden of proving this claim below, and in substance the trial court determined she did not prove it. So now on appeal, the question is whether the evidence as a matter of law compels a finding that Doug breached his fiduciary duty. (*Sonic Manufacturing, supra,* 196 Cal.App.4th 456, 466.) This standard requires us to evaluate not only whether Quin's evidence was " ' "uncontradicted and unimpeached" ' " but also " ' "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding" ' " in her favor. (*Ibid.*) Quin has not demonstrated that it is.

## C.   Analysis

Spouses owe each other "a duty of the highest good faith and fair dealing" and may not "take any unfair advantage of the other." (§ 721, subd. (b).) But mere negligence in the management of a community asset is not a breach of a spouse's fiduciary duty. To establish a breach of fiduciary duty in the management of a community asset, a spouse's improvident decision(s) must be "grossly negligent," "reckless," "intentional," "or a knowing violation of law." (Corp. Code, § 16404, subd. (c), incorporated by Fam. Code, § 721, subd. (b); *In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 149.) "[A] spouse's 'bad business judgment' in making [community property] investments, to the extent it amounts only to *ordinary negligence*, is not a breach of fiduciary duty; and the managing spouse, in such circumstances, cannot be held responsible to the other spouse for [a decision] that (by hindsight) has gone bad." (Hogoboom & King, *supra,* ¶ 8.606.2.)

61

Quin has not demonstrated the evidence compelled a finding that Doug's actions concerning the sale of the Faxon home were grossly negligent, reckless or even worse ("intentional").

To begin, her arguments fail to consider our standard of review. (See *In re I.B.* (2020) 53 Cal.App.5th 133, 156 [summarily rejecting appellate argument for similar reasons].) " 'Arguments should be tailored according to the applicable standard of appellate review,' " and the "[f]ailure to acknowledge the proper scope of review is a concession of a lack of merit." (*Sonic Manufacturing, supra*, 196 Cal.App.4th at p. 465.) Quin has not attempted to explain why her evidence was not just uncontradicted but also of such a character that it *compelled* a finding Doug breached his fiduciary duty. It was her burden, and on appeal we must " ' "consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." ' " (*Gola v. University of San Francisco* (2023) 90 Cal.App.5th 548, 557.) We also are not required to credit a witness's testimony on appeal simply because it is undisputed. " '[S]o long as the trier of fact does not act arbitrarily and has a rational ground for doing so, it may reject the testimony of a witness even though the witness is uncontradicted. [Citations.] Consequently, the testimony of a witness which has been rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.' " (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 422.) Her arguments do not heed these principles.

Even if we considered her argument on the merits, we would reject it. The evidence at most suggests that had Doug not refused the $18.75 million offer the parties' home would have sold for that price, whereas ultimately, several years later, it sold for $2.25 million less. But Quin has not

demonstrated that Doug's refusal of the $18.75 million offer in early 2014, while in hindsight a poor decision, was grossly negligent. Although there is evidence Quin herself wanted to accept the $18.75 million offer, Doug was not the only one who thought it was too low. The trial court could reasonably infer that even Quin's own counsel at the time thought so too, as evidenced by Quin's recollection that her lawyer at the time *thought she should counter the offer*. Furthermore, despite the fact that Quin herself had an appraisal valuing the property at $18.75 million, both the court-appointed co-realtors and, later, the court-appointed receiver, listed the property for sale at prices considerably higher after the $18.75 million offer had been made ($22 million and $20.7 million, respectively), from which it can be reasonably inferred that they too believed the home could potentially fetch a higher price. And there was testimony that the co-listing agents had been willing to list it for even more, $22.9 million. This record does not compel a finding that Doug's refusal to accept $18.75 million was grossly negligent.

Nor has Quin demonstrated that Doug's refusal to lower the asking price was grossly negligent. As noted, Quin initially agreed with the $25 million asking price. And when Doug declined the initial listing agent's recommendation to lower it a few months later, he did not refuse arbitrarily. Rather, he gave a facially reasonable explanation which was a concern with the adequacy of advertising in foreign markets. Quin has not shown that his concern was a pretext, or grossly unjustified given the marketing efforts that had been undertaken to date. And although it is undisputed Doug later would not agree to drop the price further from $22 million to $19.8 million when the co-listing agents recommended it, here again, he provided a lengthy written explanation of his reasons, supported by a detailed analysis of the comparable sales data and other market information. The specifics are

immaterial; Quin hasn't demonstrated his reasons were grossly unjustified or arbitrary. In addition, the court-appointed receiver subsequently listed the property above the $19.8 million reduced price they recommended (as noted, at $20.7 million). We agree with Doug that, at best, rational minds could and did differ about how to price the property, with Doug (and initially Quin) favoring an aggressive asking price. Quin's own chosen listing agent testified that pricing real estate "isn't an exact science. One never knows." Nothing that Quin has cited or discussed establishes as matter of law that Doug's actions were grossly negligent (or worse). In her opening brief, she does she does not even contend otherwise.[32]

Finally, Doug's expert testified the home's value was depressed by the rancorous litigation involved in selling it. And the trial court laid equal blame for that on Quin. It found that "both parties generated an extraordinary amount of litigation regarding all aspects of the sale" and the litigation they each engaged in was "excessive." Quin does not challenge that finding on appeal. We thus agree with Doug the court could reasonably infer

---

[32] In her reply brief for the first time she asserts, without citing any legal authority, that his actions "constituted gross negligence" because the real estate market was " 'incredibly fast,' " where the median number of days on the market was 50 days. The contention has been forfeited because it was not made in Quin's opening brief. (See *Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2022) 77 Cal.App.5th 971, 997; *Herrera v. Doctors Medical Center of Modesto*, *supra*, 67 Cal.App.5th at p. 548 [" 'It is elementary that points raised for the first time in a reply brief are not considered by the court' "].) It also is forfeited because it is unsupported by any legal authority and analysis of "gross" versus ordinary negligence. We may and do disregard conclusory points such as this because it is an appellant's burden to supply a cogent legal argument supported by legal authority. (See *Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 654; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153.)

that the depressed sales price resulted from the parties' combined inability to work together without court intervention, not Doug's unilateral intransigence.

Neither of the two cases Quin cites compel reversal. *In re Marriage of Kochan* (2011) 193 Cal.App.4th 420 held that substantial evidence supported a determination that a husband breached his fiduciary duty by failing to pay the mortgage on the parties' home, and by deliberately refusing to put the home on the market for sale during a period in which he had exclusive use and occupancy of the home and a restraining order barred wife from the home while he was present. (*Id.* at pp. 431-433.) On appeal, the husband only challenged three specific, subsidiary trial court findings as unsupported by the evidence, but did not argue that the findings, if supported by substantial evidence, were legally insufficient to constitute a breach of his fiduciary duty and so that question was not at issue. (See *id.* at pp. 431-432.) Without any discussion of the law concerning marital fiduciary duties, the appellate court rejected his sufficiency of the evidence challenges and concluded, "the evidence establishes that [husband] just did not want to take any responsibility, or exert any effort, to preserve the value of the residence through a sale." (*Id.* at p. 433.) The facts of *Kochan* are entirely dissimilar; the legal sufficiency of the court's findings was not at issue in that case. And critically, unlike in *Kochan*, the question here is not whether there is substantial evidence that would have supported a finding in Quin's favor but whether her evidence *compelled* that determination.

*In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987 (*Hokanson*) is irrelevant for similar reasons, chiefly because it also does not address the sufficiency of the evidence to compel a finding of spousal breach of fiduciary duty. The appeal arose from a trial court's determination that a wife's

dilatory conduct in the sale of the marital home breached her fiduciary duty (again, under different circumstances than here), but the principal issues had nothing to do with the wife's conduct.[33] In a footnote, *Hokanson* also rejected a "conclusory" argument by the wife about her conduct: it summarily upheld the court's finding she breached her fiduciary duty in the sale of the home despite no proof she ever prevented the broker from also communicating with her husband. In holding that no such proof was required it reasoned that, under the law, she herself had a fiduciary duty to cooperate in the sale of the home, and it also noted there was "ample evidence in the record that she delayed the sale and failed to communicate information to [husband]." (*Id.* at p. 992, fn. 3.) The lack of any analysis on the latter point renders it of little utility. More to the point, *Hokanson* is distinguishable, principally because the finding of breach of fiduciary duty was premised on the wife's failure to list the home for sale sooner (in January 1995), not her refusal to lower the listing price, although she did indeed refuse. (See *id.* at pp. 990, 991.) Above all, like *Kochan*, *Hokanson* does not address whether the evidence in that case compelled a finding of breach of fiduciary duty, only whether it was sufficient.

In sum, the trial court did not err in rejecting Quin's claim for breach of fiduciary duty.

---

[33] The main issues were the prevailing husband's contentions he was improperly denied an award of attorney fees (*Hokanson, supra,* 68 Cal.App.4th at p. 992), substantial evidence did not support the court's finding about the price at which the house would have sold had it been listed sooner (*id.* at p. 994; see also *id.* at p. 990), a claimed error in the calculation of husband's damages (*id.* at pp. 994-995), and wife's challenge to the admission of expert valuation evidence (see *id.* at p. 995).

## DISPOSITION

The judgment is reversed insofar as it characterizes the penalty assessed in the SEC action as a community obligation, and the matter is remanded with instructions to characterize the penalty as Doug's separate obligation and to re-calculate the parties' respective financial obligations accordingly. In all other respects the judgment is affirmed.

_____
                    STEWART, P.J.


We concur.


_____
MILLER, J.


_____
MARKMAN, J.*




*Whitman v. Whitman* (A157055)

_____
     * Judge of the Alameda Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

68

Trial Court:  San Mateo County Superior Court

Trial Judge:  Hon. Elizabeth M. Hill

Counsel:

McManis Faulkner, James McManis, William Faulkner, Brandon Rose, and Beverly Bergstrom, for Appellant Quin Whitman.

California Appellate Law Group, Complex Appellate Litigation Group, Charles Kagay, Robert A. Roth, and Kelly A. Woodruff, for Appellant Douglas F. Whitman.